**21 MAG 7540**

Approved: _____
Thane Rehn/Abigail S. Kurland
Assistant U.S. Attorney

Before:   HONORABLE ROBERT W. LEHRBURGER
          United States Magistrate Judge
          Southern District of New York

- - - - - - - - - - - - - - - - - x
                                   :    **SEALED COMPLAINT**
UNITED STATES OF AMERICA           :    Violation of 18 U.S.C.
                                   :    § 1349
         - v. -                    :
                                   :    COUNTY OF OFFENSE:
EPHRAIM JOSEPH ULLMANN,            :    NEW YORK
   a/k/a "Joseph Ullmann," and     :
JOHN R. RICE, III.,                :
                                   :
         Defendants.               :
                                   :
- - - - - - - - - - - - - - - - - x

SOUTHERN DISTRICT OF NEW YORK, ss.:

KRISTIN ALLAIN, being duly sworn, deposes and says that she is a Special Agent with the Federal Bureau of Investigation ("FBI"), and charges as follows:

## COUNT ONE
### (Conspiracy to Commit Wire Fraud)

1. From in or about at least November 2014, through at least 2020, in the Southern District of New York and elsewhere, EPHRAIM JOSEPH ULLMANN, a/k/a "Joseph Ullmann," and JOHN R. RICE, III., the defendants, and others known and unknown, knowingly and willfully did combine, conspire, confederate and agree together and with each other to commit wire fraud, in violation of Title 18, United States Code, Section 1343.

2. It was a part and an object of the conspiracy that EPHRAIM JOSEPH ULLMANN, a/k/a "Joseph Ullmann," and JOHN R. RICE, the defendants, and others known and unknown, having devised and intending to devise a scheme and artifice to defraud, and for obtaining money and property by means of false and fraudulent pretenses, representations, and promises, and attempting to do so, would and did transmit and caused to be transmitted by means of wire, radio, and television

communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds for the purpose of executing such scheme and artifice, in violation of Title 18, United States Code, Section 1343, to wit, ULLMANN and RICE and others participated in a fraudulent loan scheme to obtain and steal advance fees provided by investors of multiple fledging businesses when, in reality, there was no loan available to the victims.

(Title 18, United States Code, Section 1349.)

The bases for my knowledge and for the foregoing charge are, in part, as follows:

3. I am a Special Agent with the Federal Bureau of Investigation ("FBI") and have worked at the FBI since approximately July 2017. I am currently assigned to the C-43 Squad, which investigates securities fraud and complex financial crimes, where I am responsible for conducting and assisting in investigations into money laundering, wire fraud, and other types of financial crimes. I have participated in numerous investigations, during the course of which I have (a) conducted physical and wire surveillance; (b) executed search warrants at locations where evidence of criminal activity has been found; (c) reviewed and analyzed numerous taped conversations and records of those engaged in criminal activity; (d) debriefed victims of crime and cooperating witnesses; (e) reviewed the returns from search warrants for email addresses and other electronic evidence; and (f) conducted surveillance of individuals engaged in criminal activity. As a result of my training and experience, I am familiar with the techniques and methods of operation used by individuals involved in criminal activity to conceal their activities from detection by law enforcement authorities. In addition, I have participated in the investigation of fraud schemes and have participated in the execution of search warrants seeking the type of information sought herein.

4. I make this Affidavit based in part on my participation in the investigation and conversations with other FBI Special Agents, and other law enforcement officers; conversations with witnesses and victims of the offenses described herein; and reviews of reports and other documents prepared by agents and others.

5. Throughout this Affidavit, where I assert that a statement was made, I was not the individual to whom the

statement was made unless I specifically so state.  Rather, information about the statement was provided by the specified law-enforcement officer or other individual (who may have had either direct or indirect knowledge of the statement) to whom I have spoken or whose reports I have read and reviewed.  Such statements are set forth in substance and in part, unless otherwise indicated.

6. Furthermore, the facts and circumstances of this investigation have been summarized for the specific purposes of this Application.  I have not attempted to set forth the complete factual history of this investigation or all of its details.  In making this application, I rely only on the facts stated herein.

### Background, Relevant Individuals and Entities

7. Since in or about December 2018, the FBI has been investigating a scheme to defraud victims of funds by inducing them to wire money into bank accounts as collateral for a large loan purportedly being offered on favorable terms (the "Fraudulent Loan Scheme"). In reality, there is no loan available, and the perpetrators of the Fraudulent Loan Scheme make false representations to induce the victims to wire money into accounts they control.  I have personally interviewed or spoken to other law enforcement agents who have personally interviewed multiple people who claim to be victims of the Fraudulent Loan Scheme, and have reviewed documents provided by victims as well as documents obtained from banks through subpoenas and from email service providers through search warrants.

8. Based on my experience with this investigation, I have learned about the following relevant individuals and entities:

   a. EPHRAIM JOSEPH ULLMANN, a/k/a "Joseph ULLMANN," the defendant, is a businessperson and is affiliated with multiple companies, including but not limited to, Investors Security Insurance Company, LTD ("ISIC"), registered in Oklahoma under an American Indian tribe (the "Tribe").  At all times relevant to this Complaint, ULLMANN resided and maintained an office in Manhattan, New York.

   b. JOHN R. RICE, III., the defendant, is a businessperson who maintains an office in Manhattan, New York, and is affiliated with multiple companies.

### The SWIFT Correspondent Banking System

9.      Based on my training, experience, and involvement in this investigation, I know that the Society for Worldwide Interbank Financial Telecommunication system ("SWIFT") is a messaging network used by financial institutions around the world. SWIFT oversees and administers the core secure financial messaging system used by more than 11,000 financial institutions throughout the world. Accordingly, a SWIFT message is a standard format message typically sent from one financial institution to another to record a financial transaction between the institutions. A SWIFT message typically includes information about the sending bank and bank account, the receiving bank and bank account, the date and amount of the transaction, and also assigns a unique transaction reference number to the financial transaction.

### Standby Letters of Credit

10.     Based on my training and experience with this investigation, I know that a standby letter of credit ("SBLC") is a legally binding document that guarantees a bank's commitment to provide funds to a seller if a bank's client defaults on an agreement. A SBLC is often used to facilitate large sales of goods.

### Scheme to Defraud Victims-1 and -2

11.     As set forth in further detail below, from at least in or about November 2014 up to and including in or about 2018, EPHRAIM JOSEPH ULLMANN, a/k/a "Joseph Ullmann," and JOHN R. RICE III, the defendants, and others known and unknown, participated in a fraudulent loan scheme to obtain and steal advance fees provided by investors in a business (the "Home Building Victims") that sought to obtain a loan that would enable the Home Building Victims to establish a home building company (the "Home Building Company"). In reality, there was no loan available and the representations made by ULLMANN about providing the Home Building Victims with a loan were false.

12.     Based on my interview of one of the investors in the Home Building Company ("Victim-1"), I have learned the following, in sum and substance:

    a.      Beginning in about 2014, Victim-1 and four other investors created a business plan for the Home Building Company and began to search for funding. In or about Fall 2014, Victim-1

4

met EPHRAIM JOSEPH ULLMANN, a/k/a "Joseph Ullmann," the defendant; ULLMANN represented to the Victims that ULLMANN could secure funding for the Company.

        b.    ULLMANN told Victim-1, in sum and substance, that ULLMANN had been hired by the Tribe to use Tribal bonds which were earning a low interest rate as collateral for large loans with a higher interest rate to generate additional income for the Tribe.

        c.    ULLMANN represented that he would use the Tribal bonds as collateral for a loan at a bank in London, England ("Bank-1"), which would lend money to the Home Building Company at an interest rate of approximately 4%, a portion of which would go to the Tribe. In order to obtain the first installment of the loan, the Company would have to provide $600,000 in "seed capital" to a bank account designated by ULLMANN. In return, the Victims would receive $125 million in several installments, including a first installment of $6,000,000 within 8 to 12 weeks of receipt of the seed capital.

        d.    Victim-1 and ULLMANN then engaged in negotiations about the purported loan, including over the telephone and over email.

        e.    On or about November 29, 2014, ULLMANN and Victim-1 entered into a Loan and Security Agreement (the "LASA") between the Company, and ISIC, which ULLMANN described as one of the Tribe's companies which was purportedly represented by ULLMANN.

        f.    Pursuant to the LASA, Victim-1 and the other investors in the Home Building Company were to wire $600,000 into an account in the name of a different company (the "Bank-1 Account") at Bank-1. On or about December 1, 2014, through December 3, 2014, Victim-1 and two other investors in the Home Building Company each wired $200,000 into the Bank-1 Account. Based on representations by ULLMANN, Victim-1 and the other two investors anticipated that the first draw of loan funds totaling approximately $6 million would be available about 8 to 12 weeks after the seed capital was transferred to the Bank-1 Account.

        g.    By January 2015, none of the loan funds had been released and ULLMANN returned approximately $300,000 of the $600,000 provided by Victim-1 and the other two original investors. In or about March 2015, one of the other two investors no longer wanted to participate in the venture and

that investor's investment was bought out by another investor ("Victim-2").

   h. On or about March 11, 2015, a new home building company was incorporated ("Home Building Company-2"). A novation agreement between the Home Building Company, Home Building Company-2 and ISIC was executed, which assigned the LASA to Home Building Company-2.

   i. From February 2015 through at least October 2018, Victim-1 continued to communicate with ULLMANN, and ULLMANN repeatedly represented to Victim-1 that ULLMANN was attempting to arrange new financing for Victim-1's company. ULLMANN periodically identified other banks that would be providing the funding, and sent emails attaching what were represented to be bank documents regarding funding, but Victim-1 never received the promised funding.

   j. EPHRAIM JOSEPH ULLMANN, a/k/a "Joseph Ullmann," the defendant, arranged for Victim-1 and Victim-2 to meet with JOHN R. RICE III, the defendant, who ran an investment firm (the "Firm") that would administer the loan to Home Building Company-2. On or about November 11, 2015, Victim-1 and Victim-2 met with ULLMANN to discuss the loan at RICE's office in Manhattan, New York. ULLMANN told Victim-1 that ULLMANN had an office in RICE's office. At the meeting, RICE did not appear to know the details of the LASA, despite ULLMANN having represented to Victim-1 that RICE'S financial firm would administer the loan funds pursuant to the LASA.

   k. In or about 2016, ULLMANN told Victim-1 that ULLMANN had secured funding for Home Building Company-2 through a bank ("Bank-2") located in Manhattan, New York.

   l. On or about August 12, 2016, Victim-1 sent an email to ULLMANN in which Victim-1 made a formal demand for the return of the full remaining balance of the seed capital. Approximately five minutes later, ULLLMANN sent an email to Victim-2 (the "August 12, 2016 Email").

   m. The August 12, 2016 Email purported to attach a SWIFT message from Bank-2 confirming the transfer of $6,000,000 to a bank account owned by Home Building Company-2. The SWIFT message listed the "Sender" as Bank-2, listed the "Applicant" as another entity with no apparent relationship to ISIC or Home Building Company-2, and listed the "Beneficiary" as Home Building Company-2.

n.  On or about August 25, 2016, ULLMANN sent an email to Victim-1 (the "August 25, 2016 Email"), attaching a slightly different variation of the SWIFT message, again purportedly confirming a transfer of $6,000,000 to a bank account owned by Home Building Company-2. The SWIFT message again listed the "Sender" as Bank-2, listed the "Applicant" as another entity with no apparent relationship to ISIC or Home Building Company-2, and listed the "Beneficiary" as Home Building Company-2.

o.  On or about August 30, 2016, ULLMANN sent an email to Victim-1 regarding the SWIFT message, in which ULLMANN wrote: "Here is what the credit guys sent." ULLMANN attached a document entitled "THIS IS AN AUTOMATICALLY GENERATED ACKNOWLEDGEMENT OO.pdf." The attached document was addressed to ULLMANN and stated that the status of the $6,000,000 payment was "Pending OFAC", which based on my training and experience I know to be a reference to the Office of Foreign Asset Control.

p.  Home Building Company-2 never received the $6,000,000 from Bank-2 or from ULLMANN.

q.  In or around September 2016, ULLMANN wired approximately $54,000 to Home Building Company-2, describing this payment, in sum and substance, as an interest payment on the remaining seed capital that had been paid by the Home Building Victims.

13.  I have spoken to an employee of Bank-2 (the "Bank-2 Employee") regarding the SWIFT message that EPHRAIM JOSEPH ULLMANN, a/k/a "Joseph Ullmann," the defendant, sent to Victim-1 attached to the August 25, 2016 Email and I provided a copy of the aforementioned SWIFT message attached to the August 25, 2016 Email to the Bank-2 Employee.  The Bank-2 Employee informed me, in sum and substance, that:

a.  Bank-2 has no record of this SWIFT message, and that the document that was attached to the August 25, 2016 Email appears to be a forged or altered document that does not reflect any actual or attempted transaction involving the Bank.

b.  There are several errors in the SWIFT message that indicate that it is not an authentic Bank-2 document. These include, but are not limited to, the fact that the: (1) aforementioned "Applicant" listed in the SWIFT message was not a client of Bank-2, (2) the "Sender" portion of the SWIFT message

7

included an incorrect derivation of Bank-2's name, and (3) Bank-2 did not have a Relationship Management Agreement ("RMA") with the bank where Home Building Company-2's account was held, so Bank-2 could not have sent this type of SWIFT message directly to that bank.

  c. Accordingly, based on my training and experience on this investigation, as well as my conversation with the Bank-2 Employee, I believe that the SWIFT message that ULLMANN emailed to Victim-1 was fake.

14. I have interviewed an individual (the "Individual") who runs a company that forms and manages "captive insurance companies" (the "Captive Formation Company"). From speaking with the Individual, I have learned the following, in sum and substance:

  a. The Individual met EPHRAIM JOSEPH ULLMANN, a/k/a "Joseph Ullmann," the defendant, through an acquaintance.

  b. In or about 2013, utilizing the Captive Formation Company's services, ULLMANN formed ISIC as a captive insurance company under the laws of the Tribe for about $5,000. While ISIC was formed under the laws of the Tribe, it was not an arm of the Tribe and it did not have access to Tribal bonds or other Tribal assets.

  c. A captive insurance company is typically an entity formed by a parent company to provide insurance to the parent company, which enables the parent company to access the reinsurance market and set its own premium pricing without dealing with a commercial insurance company.

  d. While a captive insurance company could be formed to insure against a borrower's failure to repay a loan, a captive insurance company could not be formed to lend out money to other companies.

  e. The Captive Formation Company filled in a tax return for ISIC in 2013 which reflected that ISIC had no business activity. On at least one other occasion, the Captive Formation Company populated a tax form for ULLMANN, but in or around 2015 ULLMANN stopped paying for the Company's services.

  f. Accordingly, based on my training and experience in this investigation and my discussion with the Individual, I believe that ULLMANN'S statements to Victim-1 that ISIC was one

8

of the Tribe's financial entities, that ULLMANN represented the Tribe, and that the Tribe was willing to provide Victim-1 with a loan collateralized by Tribal bonds were false and meant to induce Victim-1 into providing ULLMANN with the "seed capital" for the purported loan.

<u>Scheme to Defraud Victim-3</u>

15. I have spoken with another victim ("Victim-3") who informed me of the following, in sum and substance:

    a. Victim-3 is a businessperson who invests money through a company (the "Victim-3 Company"), which is managed by Victim-3 and Victim-3's brother (the "Brother").

    b. In or about April or May 2016, Victim-3 was approached by a friend (the "Friend") with an investment opportunity. The Friend had a business (the "Oil Company") that was in the energy and oil sector and the Friend needed several million dollars to open a multi-million dollar line of credit via a standby letter of credit ("SBLC") in order to purchase oil for resale.

    c. The Friend informed Victim-3 that EPHRAIM JOSEPH ULLMANN, a/k/a "Joseph Ullmann," the defendant, and a coconspirator not named herein ("CC-1") were going to create a line of credit so that the Friend could buy and sell fuel if Victim-3 could provide seed capital.

    d. In return for Victim-3's investment, the Friend promised Victim-3 that Victim-3 would have a 50% interest in the Oil Company and receive 50% of the Oil Company's profits.

16. I have spoken to the Brother, from which I learned the following, in sum and substance:

    a. The Brother is Victim-3's money manager. The Victim-3 Company is a holding company that invests funds in various ventures.

    b. The Friend told the Brother that the Friend had secured a supply of 2 million barrels of jet fuel specific to commercial airlines. The deal would be more lucrative for the Friend if instead of acting as a broker, the Friend owned the fuel and sold it; in order to do so, the Friend needed funding to purchase the fuel.

   c. The Friend introduced the Brother and Victim-3 to CC-1. CC-1 indicated that CC-1 was in the fuel business and could structure a deal to secure collateral for the Friend in order to purchase the fuel.

   d. The Friend told the Brother that a $3.6 million investment of seed capital would secure a $55 million dollar line of credit.

 17. I have spoken to the Friend, from whom I learned the following, in sum and substance:

   a. The Friend met CC-1 through a mutual acquaintance in or about 2015. The Friend was told that CC-1 funded large business projects.

   b. CC-1 indicated that if the Friend could secure seed capital, CC-1 could get a line of credit in the amount of $50 million from CC-1's connections in New York so that the Friend could buy and sell petroleum. The Friend would need to provide $3.6 million in seed capital to secure the line of credit.

   c. CC-1 told the Friend that the person in New York who would open the line of credit was EPHRAIM JOSEPH ULLMANN, a/k/a "Joseph Ullman," the defendant.

   d. CC-1 told the Friend that the $3.6 million in seed capital would be held in escrow for up to a year or until the line of credit opened. CC-1 indicated that the line of credit would come from Wells Fargo or another "top ten" bank.

 18. From the Brother I further learned, in sum and substance, the following:

   a. On or about May 25, 2016, Victim-3 caused two wire transfers into a bank account in the name of a business entity controlled by CC-1 (the "CC-1 Company"). Specifically, $1 million was sent from an account in Victim-3's name and $2.6 million was sent from an account in the name of the Victim-3 Company. For several months following the transfer of the seed capital, however, the line of credit never materialized.

   b. On or about May 31, 2016, CC-1 confirmed receipt of the transferred funds and told them, in sum and substance, that EPHRAIM JOSEPH ULLMANN, a/k/a "Joseph Ullmann," the defendant, "from the insurance company" was processing the deal and it would be completed within days.

   c. The Brother believed that ULLMANN worked for a "captive insurance company" called ISIC Global.

   d. Through his communications with ULLMANN and CC-1, the Brother was led to believe that the line of credit would be opened at a "top ten" bank, such as JP Morgan Chase or Wells Fargo.

 19. I have reviewed financial records obtained from several banks and have learned, among other things, the following:

   a. On or about May 25, 2016, a bank account in the name of Victim-3 wired $1 million into a bank account in the name of the CC-1 Company (the "CC-1 Company Account").

   b. On or about May 25, 2016, a bank account in the name of the Victim-3 Company wired $2.6 million into the CC-1 Company Account.

   c. Immediately prior to the wires received from Victim-3 and the Victim-3 Company, the CC-1 Company Account had a balance of approximately $1,500.

   d. On or about May 26, 2016, the CC-1 Company Account wired $7,195 to a bank account in the name of a business entity controlled by EPHRAIM JOSEPH ULLMANN, a/k/a "Joseph Ullmann," the defendant (the "Ullmann Company Account").

   e. On or about May 31, 2016, the CC-1 Company Account wired $3.4 million into a type of escrow account known as an Interest on Lawyer Account in the name of an attorney (the "Attorney IOLA Account"). Immediately prior to this transaction, the Attorney IOLA Account had a balance of approximately $78,000.

   f. Although CC-1 had stated to the Friend that the money from Victim-3 would be held in escrow for up to a year or until the letter of credit opened, see supra ¶ 17(d), the bulk of the Victim-3 funds were distributed to CC-1, JOHN S. RICE III, the defendant, and ULLMANN shortly after they were wired to the Attorney IOLA Account.

   g. On or about June 3, 2016, the Attorney IOLA Account wired $68,000 to the CC-1 Company Account.

   h. On or about June 7, 2016, the Attorney IOLA Account wired $30,000 to the Ullmann Company Account.

11

       i.  On or about June 29, 2016, the CC-1 Company Account wired $19,000 to the Ullmann Company Account.

       j.  Between on or about June 10, 2016, and June 28, 2016, the Attorney IOLA Account made three wire transfers for a total of $2,532,731.56 to an account in the name of a company controlled by RICE (the "Rice Company-1 Account").

       k.  On or about June 22, 2016, the Attorney IOLA Account wired $40,000 to an account in the name of a second company controlled by RICE (the "Rice Company-2 Account").

       l.  After receiving more than $2.5 million of Victim-3's funds from the Attorney IOLA Account, the Rice Company-1 Account made two wire transfers for a total of $510,000 to the CC-1 Company Account on or about June 30, 2016, and August 31, 2016.

       m.  On or about August 4, 2016, RICE opened two additional bank accounts in the name of Rice Company-1 (the "Second Rice Company-1 Bank Account" and the "Third Rice Company-1 Bank Account").

       n.  On or about September 14, 2016, RICE drafted a check from the Rice Company-1 Account for $1,987,301.24 payable to the Second Rice Company-1 Account, and on or about October 4, 2016, the Second Rice Company-1 Account wired $1,887,801.24 to the Third Rice Company-1 Account.

       o.  On or about October 28, 2016, the Third Rice Company-1 Account wired $300,000 to the CC-1 Company Account.

       p.  Between on or about October 11, 2016, and on or about June 16, 2017, RICE executed more than 15 wire transfers out of the Third Rice Company-1 Account to various other bank accounts. By on or about June 16, 2017, the vast majority of the $1,887,801.24 in Victim-3 funds that had been transferred into the Third Rice Company-1 Account had been dissipated, and the remaining balance in the account was below $100,000.

    20.  Based on my review of emails from an account used by EPHRAIM JOSEPH ULLMANN, a/k/a "Joseph Ullmann," the defendant (the "Ullmann Email Account"), which I obtained pursuant to a search warrant for the contents of the Ullmann Email Account, I have learned the following, among other things:

       a.  On or about June 17, 2016, ULLMANN sent an email to JOHN R. RICE III, the defendant, which stated the following:

```
Dear John
please address the letter to [the Friend]
he is the one in front of this Lift
what they are doing is buying product that is in the tank
what they have been asked to provide is a letter that is
saying they have
up to 45 million available to them in a letter of credit
provided as a DLC

Maybe it can say something like

To: [the Friend], Managing Director
[The Oil Company]
Gentleman;
This letter is provided as credit confirmation that based
on the
contract completed with your company and our credit group,
we
confirm that subject to the needs of your seller, we are
standing by to deliver
one or more DLC (documentary Letters of Credit) supplied in
support of your
product purchases, issued by our bank Wells Fargo delivered
to your product
seller at its bank, sent Bank to Bank to the account
provided by your seller

Please be advised that subject to the text of the DLC and
final underwriting
you have credit exceeding $45,000,000 available for your
use in support of product purchases. .
Please provide the TEXT of the requested DLC so that we may
completed
the processing of this credit on your behalf.

Once issued the Letter of Credit can be verified on a bank
to bank bases
thank you for your patronage.
```

  b. On or about June 17, 2016, RICE emailed to ULLMANN a letter on the letterhead of a company controlled by RICE ("Rice Company-3"), that was similar to the letter suggested by ULLMANN and, in sum and substance, represented that Rice Company-3 was ready to issue a cash-backed credit facility from Wells Fargo or an equivalent bank (the "Rice Company-3 Letter").

13

   c. On or about June 20, 2016, ULLMANN emailed the Rice Company-3 Letter to CC-1 and also attached a purported "compliance notice" (the "Compliance Notice"), which represented, in sum and substance, that a "bank to bank" credit had been established for the Oil Company and that the funds would be available within two days. On the same date, CC-1 then emailed the Rice Company-3 Letter and the Compliance Notice to the Friend, copying ULLMANN on the email.

   d. On or about June 23, 2016, ULLMANN sent an email to the Friend that stated, in sum and substance, that ULLMANN had had a "bank call" that day with a "credit manager in London," and that the Friend would be provided with a bank account "containing funds exceeding your needs."

 21. From the Friend, I further learned, in sum and substance, that:

   a. Despite having received the Rice Company-3 Letter from CC-1 regarding a letter of credit to be issued by Wells Fargo, no letter of credit from Wells Fargo was ever issued to the Oil Company.

   b. Despite having received the June 23, 2016, email from ULLMANN regarding financing from London, no such financing was ever received by the Oil Company.

   c. On or about July 20, 2016, the Friend received an email from CC-1 stating that another bank ("Bank-4"), which was not a bank previously known to the Friend, was verifying that funds exceeding $65 million were deposited into an account at Bank-4 in London, UK.

   d. Because the email from CC-1 was inconsistent with CC-1's prior representations, on or about July 21, 2016, the Friend sent an email to CC-1 asking for the return of the $3.6 million that had been wired by Victim-3, but the money was not returned.

   e. The friend again emailed CC-1 on or about July 25, 2016, requesting that CC-1 return the $3.6 million that Victim-3 invested in support of Company-3's attempt to sell petroleum. The Friend wrote that "[n]ot one thing has gone the way it was presented per the contract that was drawn up by you and Joseph Ullman [sic]. This was suppose to go through JP Morgan which never came to fruition, then switched the credit facility from Bank of America, then to Wellsfargo which hasn't happened, and it finally came through at [Bank-4]. which is not a real bank. As it turns

14

out the number and address you sent to me was to a virtual office in London whom I can't get in touch with anyone there and is all over google as a fraudulent address for scams. This Bank was never agreed upon by me or any of my associates as we were waiting for a top 10 banking institution to handle our business. . . . [CC-1], you are directly involved in what seems to be a fraudulent scheme and will be treated as such if the fund s are not returned immediately."

    22. From the Brother, I have further learned, among other things, the following:

        a.    Following the failure of the Oil Company to receive the promised financing in summer 2016, the Brother engaged in various communications with EPHRAIM JOSEPH ULLMANN, a/k/a "Joseph Ullmann," the defendant, JOHN R. RICE III, the defendant, and CC-1, in which the Brother attempted to obtain the promised financing or, in the alternative, the return of the Victim-3 funds. During these communications, ULLMANN, RICE, and CC-1 made representations that, in sum or substance, the Victim-3 funds were being held in an account that prevented their immediate return.

        b.    For instance, on or about November 30, 2016, CC-1 sent an email to the Brother, copying ULLMANN, in which CC-1 stated: "Regarding the return of the funds let me say that I completely understand all concerns and eagerness. If it were in my power to immediately undo all that has been done and return the funds I would do so. However, just as I understand your concerns, you must understand that I have to work within the bounds of what is financially possible given all the various changes from our original contract that have occurred. The money was not simply placed in an account that was kept liquid, unencumbered and immediately available as it forms part of the security for the contemplated DLC. . . . At present I am told by ISIC the funds have been invested in an investment of 12 months duration and cannot be withdrawn until maturity."

        c.    Based on my review of the financial data described supra, ¶ 19, I have learned that the representation made in CC-1's November 30, 2016 email that the Victim-3 funds were in an investment with a 12-month duration was false, and that the vast majority of the Victim-3 funds had already been transmitted to entities controlled by RICE, ULLMANN, and CC-1.

        d.    On or about December 8, 2016, ULLMANN wrote an email to the Brother, copying CC-1, in which ULLMANN stated: "we are stopping every thing and providing to you the original,

invested funds, and a rate of return." However, the Victim-3 funds were not returned following this email.

  e. On or about February 3, 2017, CC-1 forwarded an email from RICE to the Brother, which stated, in sum and substance, that another bank ("Bank-5") would be wiring the Victim-3 funds back within "a few days." The Brother had not previously understood Bank-5 to be involved with the transaction.

  f. On or about February 16, 2017, the Brother, ULLMANN, RICE, and CC-1 participated in a conference call to address the Brother's concerns regarding Victim-3's money. During the conference call, several excuses for why Victim-3's money was trapped were conveyed.

  g. On or about June 8, 2017, RICE sent an email to the Brother in which Rice stated, in sum and substance, that there had been a delay in getting the funds returned due to an "error of some sort in the SWIFT codes made by the sending bank," and that the correct SWIFT codes would be received "this week."

  h. From in or around late 2017 through in or around early 2018, the Brother spoke to RICE and CC-1 by telephone approximately 7-10 times and during one conversation, RICE represented to the Brother that Victim-3's money was trapped overseas and that retrieving it would require travel to Hong Kong. At other times, RICE alluded to potential future transactions that were on the horizon and told the Brother that Victim-3's investment was mingled with other investors' money as a part of a pooled blanket fund.

  i. In addition to the email and telephone communications, RICE sent a number of text messages to the Brother, which continued at least into November 2019. In these text messages, in sum and substance, RICE gave a variety of excuses for why RICE was unable to return Victim-3's money, and regularly represented that the money was just a few days from being returned. For example, on or about April 12, 2019, RICE sent the Brother a text message stating that he was "waiting for a SWIFT confirmation" which he needed before Victim-3's money could be returned. Approximately two weeks later, on or about April 26, 2016, the Brother sent a follow-up message to RICE asking about this, and RICE responded by representing that he had spoken with a banker and that "the problem will be solved within another 2-3 banking days." On or about November 5, 2019,

RICE sent the Brother a text message stating that he was "[w]aiting for the signed trade contract documents to be released."

  j. Based on my training and my experience in investigating fraud schemes, I believe that these messages were intended to placate the Brother who was continuing to request the return of Victim-3's investment, and to lull the Brother into continuing to wait for the promised return of the funds, rather than taking such steps as contacting law enforcement regarding the fraud.

 23. To date, Victim-3's money has not been returned.

 WHEREFORE, I respectfully request that EPHRAIM JOSEPH ULLMANN, a/k/a "Joseph Ullmann," and JOHN R. RICE III, the defendants, be arrested, and imprisoned or bailed, as the case may be.

          S/ by the Court with permission
          _____
          KRISTIN ALLAIN
          Special Agent
          Federal Bureau of Investigation

Sworn to before me this
2d day of August, 2021

_____
HONORABLE ROBERT W. LEHRBURGER
United States Magistrate Judge
Southern District of New York