

**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

February 6, 2023

**BY ECF**
The Honorable Richard M. Berman
Southern District of New York
500 Pearl Street
New York, New York 10007

   Re: *United States v. Ephraim Ullmann*, 22 Cr. 3 (RMB)

Dear Judge Berman:

  The defendant in this case, Ephraim Ullmann, is scheduled to be sentenced on February 14, 2023, at 11:00 a.m., having pled guilty to conspiracy to commit wire fraud, in violation of Title 18, United States Code, Section 1349. The Government respectfully submits this letter in advance of the sentencing. The parties stipulated in a plea agreement to a United States Sentencing Guidelines ("Guidelines") range of 41 to 51 months' imprisonment (the "Stipulated Guidelines Range"), which is the same range calculated in the presentence report ("PSR"). For the reasons set forth below, the Government submits that a sentence within the Stipulated Guidelines Range would be sufficient but not greater than necessary to serve the legitimate purposes of sentencing.

  **A. Offense Conduct**

  Ephraim Ullmann participated in a conspiracy to defraud multiple victims by making false representations that the victims would be able to obtain large loans or letters of credit on favorable terms. PSR ¶ 10. Specifically, Ullmann and his co-conspirators induced victims to wire funds to bank accounts controlled by the conspirators by falsely telling the victims that the loans were a small upfront payment that would be collateral for a much larger loan. In furtherance of the scheme, Ullmann provided victims with false documents purporting to show that banks had approved the loans or letters of credit.

  The first group of victims defrauded by Ullmann were a group of investors who were seeking to establish a home building company. PSR ¶ 15. The defendant falsely represented to these investors that he had been hired by an Indian Tribe and could use Tribal bonds as collateral for a low interest loan for the investors. PSR ¶ 16-17. He told them that they would have to provide $600,000 in what he characterized as "seed capital" before they would receive the promised installments on the loan. PSR ¶ 18. The victims sent $600,000 to a bank account designated by Ullmann in December 2014. In fact, Ullmann did not represent the Tribe and his claims that the victims could obtain a loan collateralized by Tribal bonds were false. PSR ¶ 29.

  When the promised loan did not materialize, the victims began demanding the return of their funds, and Ullmann returned $300,000 to the victims in an apparent attempt to buy time and

prevent them from reporting him to law enforcement. PSR ¶ 21. To further buy time, Ullmann continued to make false representations about the promised loan, and also provided the victims with false documents to conceal the nature of his fraudulent scheme. For instance, in August 2016, Ullmann sent an email to one of the victims, to which he attached a forged bank document that purported to confirm the transfer of funds to the victims' home building company. PSR ¶ 26.

The defendant engaged in a similar scheme with a second group of victims who were interested in funding an oil company and purchasing and selling fuel. PSR ¶ 31. Ullmann made a series of false statements to the effect that the victims could obtain a large line of credit if they provided an initial $3.6 million in seed capital. PSR ¶ 33. These statements were also false, and Ullmann and his co-conspirators did not have the ability to obtain a line of credit like that promised to the victim investors. Instead, a large portion of the victims' investment was transferred through multiple shell companies controlled by one of Ullmann's co-conspirators, with some of it paid to Ullmann.[1] PSR ¶¶ 36-42. As with the first group of victims, the second group of victims began raising concerns and demanding the return of their funds when the promised letter of credit did not materialize. Ullmann asked one of his co-conspirators to draft a letter claiming that the victims were about to receive a credit facility from Wells Fargo, which was false. PSR ¶ 43. He also created a forged "compliance notice" representing that the funds would shortly be made available to the victims, which he sent to the victims along with the letter drafted by his co-conspirator. PSR ¶ 44. Ullmann continued to make false representations about the transaction at various times in response to demands from the victims, but while this was happening Ullmann and his co-conspirators were dissipating the victim funds. PSR ¶¶ 45-48.

### B. Procedural History

A grand jury returned the Indictment against Ullmann on January 3, 2022. On May 31, 2022, the defendant entered a plea of guilty, pursuant to a plea agreement, to conspiracy to commit wire fraud, with a stipulated guidelines range of 41 to 51 months' imprisonment. On January 4, 2023, the United States Probation Office issued the presentence report in this case, which calculates a guidelines range of 41 to 51 months and recommends a term of 41 months' imprisonment. PSR at 22. On January 30, 2023, the defendant filed a sentencing submission arguing for a non-custodial sentence.

### C. Discussion

The most important sentencing factors in this case are the need to reflect the seriousness of the defendant's offense, to promote respect for the law, to provide just punishment, and to afford adequate deterrence to this defendant and other similarly situated individuals. *See* 18 U.S.C.

---

[1] Some of the money was also returned to the victims' oil company, in an apparent attempt to buy time and prevent the victims from reporting the scam to law enforcement, which is why the actual total loss amount for which Ullmann is responsible if $3,032,000, less than the initial amount obtained from the victims. PSR ¶ 52. The Government has not been able to fully trace the disposition of all the crime proceeds or identify precisely the gains that Ullmann and each of his co-conspirators realized from the fraud.

§ 3553(a)(2)(A)-(C). All of these considerations weigh in favor of a sentence within the Guidelines Range of 41 to 51 months' imprisonment.

The defendant played a central role in a conspiracy to defraud multiple victims of millions of dollars by making a series of false representations to them. In his sentencing submission, the defendant criticizes the fraud sentencing guidelines for being based primarily on loss amount. But the loss amount in this case is based solely on the actual losses suffered by victims to whom the defendant personally made false representations. The Stipulated Guidelines Range is thus driven by the direct harm caused by the defendant's individual wrongful conduct. This case is distinguishable from most of the cases cited by the defendant, which involved arguably overstated loss amounts. *See United States v. Adelson*, 441 F.Supp.2d 506, 509-12 (S.D.N.Y. 2006) (criticizing inflated guidelines level that was based on fall in stock price in securities fraud case and noting that Government itself did not defend the guidelines level); *United States v. Algahaim*, 842 F.3d 796, 800 (2d Cir. 2016) (questioning application of guidelines in food stamp fraud case where loss amount was largely generated by the number of food stamp recipients who shopped at defendant's store and improperly obtained cash from the store). The concerns raised in those cases are not present here, and the loss amount in this case provides a realistic assessment of the seriousness of the defendant's crime. Thus, the Court should follow the ordinary rule that the Guidelines are "an important benchmark against which to measure an appropriate sentence." *United States v. Corsey*, 723 F.3d 366, 375 (2d Cir. 2013).[2]

The seriousness of the defendant's crime is further aggravated by the deliberate and calculated nature of his fraudulent conduct. The defendant made repeated false representations to multiple groups of victims, and escalated his misrepresentations to conceal the nature of the fraud when the victims began to question it. This brazen fraudulent conduct extended to creating multiple forged documents that purported to show that the transactions had been approved by banks and were in process, even though the defendant fully knew that there were no such bank approvals. Moreover, the defendant used sophisticated means to induce investors to part with large sums of money, including by crafting complex and plausible explanations for the investments, creating a company that he falsely represented had an arrangement with an Indian Tribe, and providing the victims with various contracts in an effort to make the transactions appear to be legitimate.

The defendant argues generally that he should receive a below-guidelines sentence due to his background and character, as well as his family situation. He first argues that his wife's health condition would cause hardship if he was sentenced to a term of imprisonment. While it is no doubt true that Ullmann's spouse would be impacted by his incarceration, that is sadly the case for

---

[2] The defendant's sentencing submission cherry-picks several cases in which defendants received below-Guidelines sentences, but does not identify what makes his case resemble these case in particular. In fact, the examples provided by the defendant are quite different. *See United States v. Pantelakis*, 17 Cr. 87 (imposing below-Guidelines sentence when defendant had two minor children at home and had received a minor role adjustment); *United States v. Ikejimba*, 19 Cr. 318 (defendant had been incarcerated for months during the peak of the COVID-19 pandemic); *United States v. Demaria*, 17 Cr. 569 (defendant was sentenced to 36 months on a 60-month guidelines range, and the court highlighted defendant's difficult upbringing and mental health issues); *United States v. Saibu*, 16 Cr. 330 (defendant had PTSD and small child at home).

nearly all families with incarcerated loved ones. Perhaps for this reason, the Second Circuit has held that a defendant's "family ties . . . generally only justify a downward departure in 'unusual' or 'extraordinary' cases[.]" *United States v. Lyttle*, 460 F. App'x 3, 10 (2d Cir. 2012); *see also* U.S.S.G. § 5H1.6 ("In sentencing a defendant . . . family ties and responsibilities are not ordinarily relevant in determining whether a departure may be warranted."). The defendant argues that he currently provides care for his wife, but does not claim that this care is irreplaceable or otherwise substantially exceeds the harm ordinarily incident to incarceration, factors which the Guidelines counsel the Court to consider.

The defendant also submits a number of letters from various supporters. It is, of course, appropriate for the Court to take the defendant's background and these letters into account to some degree. However, the defendant does not cite anything so extraordinary in his background or character that it would warrant a substantial variance from the sentence recommended by the Sentencing Guidelines and by the Probation Office. *See, e.g., United States v. Rioux*, 97 F.3d 648, 663 (2d Cir. 1996) (noting that personal factors should ordinarily only support a downward departure in "extraordinary cases" where multiple factors "combine to create a situation that differs significantly from the heartland cases covered by the guidelines"). While the Government does not dispute that the defendant has helped others in the course of his life and career, these characteristics are not out of the ordinary for a white collar criminal and do not outweigh the other sentencing factors that weigh in favor of a substantial sentence of incarceration. *See United States v. Regensberg*, 635 F.Supp.2d 306, 308-10 (S.D.N.Y. 2009) (noting that an array of letters from the community "falls into a pattern advanced by a subset of the white collar criminal," and noting that in many cases it is a defendant's very reputation in the community that can facilitate his ability to commit this type of fraud); *United States v. Vrdolyak*, 593 F.3d 676, 682-83 (7th Cir. 2010) ("[I]t is usual and ordinary, in the prosecution of similar white-collar crimes . . . to find that a defendant was involved as a leader in community charities, civic organizations, and church efforts," and the defendant "should not be allowed to treat charity as a get-out-of-jail card" (citation and internal quotation marks omitted)). To deter the defendant and other similarly situated defendants from future crimes, and to respond to the seriousness of his crime with an appropriate punishment, a sentence within the Guidelines Range is warranted.

Very truly yours,

DAMIAN WILLIAMS
United States Attorney

by: _____
Thane Rehn
Assistant United States Attorney
(212) 637-2354